[Cite as *State ex rel. Repic v. Indus. Comm.*, 2016-Ohio-7666.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| The State ex rel. Maryann Repic, | : | |
| Relator, | : | |
| v. | : | No. 15AP-627 |
| Industrial Commission of Ohio and | : | (REGULAR CALENDAR) |
| Geauga Mechanical Co. Inc., | : | |
| Respondents. | : | |

D E C I S I O N

Rendered on November 8, 2016

*Burkes Law, LLC,* and *John F. Burke, III,* for relator.

*Michael DeWine,* Attorney General, and *Kevin J. Reis,* for respondent Industrial Commission of Ohio.

IN MANDAMUS
ON OBJECTIONS TO THE MAGISTRATE'S DECISION

TYACK, J.

{¶ 1} Maryann Repic filed this action in mandamus seeking a writ to compel the Industrial Commission of Ohio ("commission") to overturn its order declaring an overpayment of living maintenance wage loss ("LMWL") compensation and a finding that the compensation was fraudulently obtained.

{¶ 2} In accord with Loc.R. 13(M) of the Tenth District Court of Appeals, the case was referred to a magistrate to conduct appropriate proceedings. The parties stipulated the pertinent evidence and filed briefs. The magistrate then issued a magistrate's decision, appended hereto, which contains detailed findings of fact and conclusions of

law.  The magistrate's decision includes a recommendation that we deny the request for a writ of mandamus.

{¶ 3}   Counsel for Maryann Repic has filed objections to the magistrate's decision. Counsel for the commission has filed a memorandum in response.  The case is now before the court for a full, independent review.

{¶ 4}   As noted in the magistrate's decision, Repic claimed that she was employed by a business called Pet Paws, LLC.  She presented to the Ohio Bureau of Workers' Compensation ("BWC") paperwork to support LMWL.  Included in the paperwork were copies of what appeared to be payroll checks from Pet Paws, LLC, but an investigation revealed that some of the payroll checks were never deposited or processed through a bank.  Instead, Repic was paid cash for some of the time periods.  Repic later claimed that Pet Paws, LLC had trouble with its checking account and had bounced several checks to her.  Therefore, she started returning the checks to Pet Paws, LLC in return for cash.  She claimed that she always told BWC the correct amount she was paid.

{¶ 5}   The record before us demonstrates that Repic was working as a pipefitter when she was seriously injured.  Since she could no longer work as a pipefitter, she pursued training for a new job and became a pet groomer.  Since pet grooming does not provide the kind of income she earned before her injuries, Repic applied for LMWL.

{¶ 6}   Repic received LMWL for a few years and then someone submitted an allegation to the BWC's Safety Investigation Unit, commonly referred to as SIU, that Repic had "submitted false payroll checks associated with her employment with Pet Paws."  The allegation could imply that Repic had not worked the hours she claimed or ever worked for Pet Paws at all.  The allegation also implied that the amount she claimed she received as compensation was inaccurate.

{¶ 7}   SIU investigated the allegation and found that 29 of the 129 checks submitted to the BWC were not negotiated at the banks upon which they were drawn.

{¶ 8}   SIU interviewed a former owner of Pet Paws at an assisted living facility and was told the business closed in November 2013.

{¶ 9}   SIU interviewed Repic in July 2014 and was told by her that she was still working for Pet Paws, but at a new set of locations.  Repic stated that she stopped presenting checks to the bank in November 2013 and agreed with the current owner of

Pet Paws to be paid in cash. She told SIU that she had no records to support the claimed agreement or to verify the alleged payment.

{¶ 10} SIU also interviewed the person who then was the owner of Pet Paws, who claimed Pet Paws went bankrupt in November 2013 and no longer existed. As a result, Repic could not have worked for Pet Paws after November 2013.

{¶ 11} Repic countered the above with a claim that she started work for Pet Paws in January 2012. Her affidavit itemized several dates she said checks from Pet Paws bounced, including two checks the business supposedly issued in the month it went bankrupt.

{¶ 12} In review, the commission clearly had a valid basis for finding fraud and overpayment from November 2013 up until July 2014. Repic claimed payment from a business which the then owner and a former owner claimed no longer existed. At least "some evidence" supported the claim of overpayment from November 2013 on.

{¶ 13} The evidence as to the single week in January of 2013 for which overpayment is alleged is less clear, but we cannot find no evidence supported the commission's findings.

{¶ 14} The objections to the magistrate's decision are overruled. We adopt the findings of fact and conclusions of law contained in the magistrate's decision and deny the request for a writ of mandamus.

*Objections overruled; writ denied.*

KLATT and LUPER SCHUSTER, JJ., concur.

# APPENDIX

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| The State ex rel. Maryann Repic, | : | |
| Relator, | : | |
| v. | : | No. 15AP-627 |
| Industrial Commission of Ohio and | : | (REGULAR CALENDAR) |
| Geauga Mechanical Co. Inc., | : | |
| Respondents. | : | |

---

## MAGISTRATE'S DECISION

### Rendered on July 28, 2016

---

*Burkes Law, LLC,* and *John F. Burke, III,* for relator.

*Michael DeWine,* Attorney General, and *Kevin J. Reis,* for respondent Industrial Commission of Ohio.

---

IN MANDAMUS

{¶ 15} In this original action, relator, Maryann Repic, requests a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate the February 3, 2015 order of its staff hearing officer ("SHO") that grants the September 2, 2014 motion of the administrator of the Ohio Bureau of Workers' Compensation ("bureau") for a declaration of an overpayment of living maintenance wage loss ("LMWL") compensation, and a finding that the compensation was fraudulently obtained, and to enter an order denying the bureau's motion.

Findings of Fact:

{¶ 16} 1. On June 8, 2005, relator sustained serious injury to her right foot and lower extremity while employed as a pipefitter for respondent, Geauga Mechanical Co., Inc., a state-fund employer. The industrial claim (No. 05-352970) is also allowed for psychiatric conditions.

{¶ 17} 2. In September 2011, a vocational counselor employed by the MetroHealth System issued a report, stating:

> BACKGROUND INFORMATION
>
> Maryann Repic is a 53 year old single female who was referred for career counseling by her case manager. She is not able to return to her previous position of Pipefitter due to her physical limitations. She suffered a work-related injury on 06/08/2005. * * *
>
> Current limitations are being modified to include working as a Dog Groomer. A Medco-14 dated 08/08/2011 limits her work to part time 4 to 6 hours per day. Her [sic] reports pain at 3 on a 10 point scale.
>
> * * *
>
> RECOMMENDATIONS
>
> It is recommended that Ms. Repic participate in formalized training in pet grooming. Upon completion of the above, be assisted with developing tools for a formal job search[.] provided assistance with job lead sourcing and placement support.
>
> TARGETED POSITIONS:
> Pet Groomer DOT 418.674-010

{¶ 18} 3. On June 11, 2014, the bureau's Safety Investigations Unit ("SIU") received an allegation that relator had "submitted false payroll checks associated with her employment with Pet Paws."

{¶ 19} 4. On August 28, 2014, following an investigation, SIU issued a report recommending that all LMWL payments paid to relator from January 6 through January 12, 2013 and from November 17, 2013 through July 26, 2014 be declared as an

overpayment. The SIU report also recommended a finding that the compensation was fraudulently obtained.

{¶ 20} 5. On September 2, 2014, citing its SIU report, the bureau moved the commission to make the recommended findings regarding LMWL overpayment and fraud.

{¶ 21} 6. According to the SIU report, on July 1, 2014, Special Agent ("SA") Boscarello obtained confirmation from Dollar Bank that 14 of the 23 checks dated September 1, 2012 to June 14, 2014 and written to relator for wages earned at Pet Paws were never "negotiated."

{¶ 22} 7. According to the SIU report, on July 21, 2014, SA Boscarello obtained confirmation from Huntington National bank that 15 of the 101 checks written to Repic for wages earned at Pet Paws were never "negotiated."

{¶ 23} 8. According to the SIU report, on July 30, 2014, SA Boscarello and Fraud Analyst ("FA") Parfejewiec interviewed Gayle Schroll, former owner of Pet Paws, at an assisted living facility where Gayle Schroll resides. The SIU report summarizes the interview:

> Gayle Schroll advised the business was turned over to her son, Luke Schroll, three to four years ago when she became ill. Gayle Schroll stated at that time **REPIC** was an unpaid student and learning animal grooming at the business. Gayle Schroll believed her son hired **REPIC** as a sub-contractor for the business but was unable to provide specifics. Gayle Schroll advised the business was closed in November of 2013 and any checks submitted after that, were fraudulent. Gayle Schroll reviewed the payroll checks **REPIC** submitted to BWC since 2011 and advised none of these were completed or signed by her.

(Emphasis sic.)

{¶ 24} 9. According to the SIU report, on July 31, 2014, SA Boscarello and FA Parfejewiec interviewed relator at her apartment. The SIU report summarizes the interview:

> REPIC stated she was still employed at Pet Paws; however, the business was operating out of "Pick of the Litter" in Strongsville, OH and "Fire Plug" in Parma Heights, OH.

> REPIC advised she had stopped presenting checks in November of 2013 as same were bouncing and her account was assessed fees. **REPIC** and Luke Schroll agreed that she would be paid in cash but she would submit the non-negotiated checks as wages earned. **REPIC** stated she did not have any records confirming this agreement or how much cash she was paid.

(Emphasis sic.)

{¶ 25} 10. According to the SIU report, on August 13, 2014, SA Boscarello interviewed Luke Schroll by telephone. At that time, Luke Schroll was residing at a treatment facility outside Ohio. The SIU report summarizes the interview:

> Luke Schroll stated **REPIC** was hired as an employee of Pet Paws in Fall of 2011 or Winter of 2011-2012. Luke Schroll confirmed he drafted and issued all payroll checks to **REPIC**. Luke Schroll stated in November of 2013, Pet Paws went bankrupt and no longer existed. Luke Schroll informed **REPIC** requested he still provide her with false payroll checks, which they agreed would not be negotiated, in order for her to submit to BWC. Luke Schroll advised **REPIC** has not worked for Pet Paws since November of 2013.

(Emphasis sic.)

{¶ 26} 11. On November 10, 2014, the bureau's September 2, 2014 motion was heard by a district hearing officer ("DHO"). The DHO issued an order granting the bureau's motion. The DHO's order explains:

> It is the order of the District Hearing Officer that the Motion filed by the Bureau of Workers' Compensation on 09/02/2014 is granted and the District Hearing Officer makes a specific finding of fraud.
>
> The District Hearing Officer relied on the Bureau of Workers' Compensation Special Investigations Unit report dated 08/28/2014. The District Hearing Officer specifically finds that the Injured Worker submitted false payroll checks associated with her employment at Pet Paws to obtain living maintenance wage loss compensation benefits from 01/06/2013 through 01/12/2013 and from 11/17/2013 through 07/26/2014. The District Hearing Officer finds that

these activities are inconsistent with the Injured Worker's entitlement to living maintenance wage loss.

The specific evidence relied upon in this motion in support of the conclusion of an overpayment are attachments to the Bureau of Works' Compensation motion in an investigative report; namely Dollar Bank Financial Records/Letter, Huntington National Bank Financial Records letter, Gayle Schroll interview, Maryann Repic interview, Luke Schroll interview, the FROI-1, First Report of an Injury, Occupational Disease or Death Application, the RH-18 Authorization for Living [M]aintenance Wage Loss Application, the Bureau of Workers' Compensation Warrant Report, and EFT application.

Regarding the issue of fraud, the District Hearing Officer finds that based on information in the Bureau of Workers' Compensation Investigation Unit, the Injured Worker committed fraud due to the fact that all the elements were present. The District Hearing Officer finds that documentation listed above indicates that the Injured Worker intentionally submitted false payroll checks to the Bureau of Workers' Compensation in order to receive benefits which she would not be entitled to receive. The Staff Hearing Officer finds that all the prima facia elements of fraud are present:

<u>1) A representation, or when there is a duty to disclose, concealment of fact</u>:

The Injured Worker concealed the fact that the payroll checks she submitted to Bureau of Workers' Compensation in order to obtain living maintenance wage loss benefits for the above period were not negotiated. The payroll checks were issued from Michael or Gail Schroll (Pet Paws Owner) and Luke Schroll (Pet Paws Owner). The Injured Worker had failed to advise the Bureau of Workers' Compensation or her rehab counsellor [sic] that Pet Paws went out of business in November of 2013 and continued to submit false payroll checks to Bureau of Workers' Compensation indicating she was still working for Pet Paws. The Injured Worker additionally signed two RH-Authorizations for Living Maintenance Wage Loss Applications after the business had closed.

Injured Worker also signed six RH-18 forms with the warning sign regarding fraud.

The Injured Worker also signed electronic fund transfer application on 12/07/2007 with a similar fraud warning.

2) Which is material to the transaction at hand:

The Injured Worker had a duty to disclose to the Bureau of Workers' Compensation, Risk Employer and Rehab Personnel that she did not receive wages or suffer wage loss and she failed to do so. The Injured Worker had a duty to disclose to the Bureau of Workers' Compensation, Risk Employer and Rehab Personnel that the business in which she agreed to work in order to obtain living maintenance wage loss benefits went out of business in November of 2013 and she failed to do so. The Injured Worker's concealment entitled her to receive benefits to which she was not entitled to.

3) Made falsely with knowledge of its falsity, or with such utter disregard or recklessness as to whether it is true or false that the knowledge may be inferred:

The Injured Worker's concealment of her improper conduct caused the Bureau of Workers' Compensation to pay compensation and/or benefits. But for the concealment of her improper conduct the Bureau of Workers' Compensation would not have made the improper payments.

4) With the intent of misleading others into relying on it:

After completion signing the RH-18 form, and completing and signing the electronic funds transfer application, Injured Worker intentionally submitted false payroll checks to Bureau of Workers' Compensation in order to obtain living maintenance wage loss benefits to which she was not entitled to from the above period of time.

5) Justifiable reliance upon the presentation of concealment:

The Bureau of Workers' Compensation justifiably relied on the representations of the Injured Worker because she concealed her activities that was inconsistent with receiving workers' compensation and/or benefits.

> 6) A resulting injury proximately caused by the reliance:
>
> The Bureau of Workers' Compensation suffered injury by paying compensation to the Injured Worker when she was not entitled to receive the compensation.
>
> Based on the Bureau of Workers' Compensation Special Investigation Report on file, the Hearing Officer finds an overpayment, breach of the living maintenance wage loss contract and an overpayment for the above period of time. The actions of the Injured Worker constitute administrative fraud.

{¶ 27} 12. Relator administratively appealed the DHO's order of November 10, 2014.

{¶ 28} 13. On February 3, 2015, relator's appeal was heard by an SHO. At the hearing, relator submitted her affidavit executed February 3, 2015. The affidavit avers:

> [Two] I was injured on the job June 8, 2005. At that time I was employed by Geauga Mechanical Co., Inc.
>
> [Three] I was never able to return to my previous type of work due to its physical demands.
>
> * * *
>
> [Five] On January 3, 2012 I began receiving working wage loss payments.
>
> [Six] I was required to provide weekly information to the BWC as to any monies that I received for working.
>
> [Seven] I went to school to learn how to groom animals. The school was run by the Ohio Academy of Pet Styling which was owned and operated by Gayle Schroll.
>
> [Eight] After I finished my training I went to work on a part time basis for Pet Paws, LLC beginning approximately January 3, 2012.
>
> [Nine] The business was owned and operated by Gayle Schroll. Luke Schroll was working there.

[Ten] Eventually the owners' son Luke Schroll took over the business.

[Eleven] He had financial and substance abuse issues. He passed away on October 5, 2014 at the age of 23.

[Twelve] In January 2013 after faxing a copy of my wages check from Pet Paws to the BWC Luke Schroll asked me if I had cashed my check yet. I indicated that I had not and he requested the check back and gave me cash.

[Thirteen] The checks he wrote to me would not have sufficient funds in the account and would bounce. I was then charged fees by the bank because the checks were not honored.

[Fourteen] This occurred on several occasions including March 21, 2012, July 25, 2013, October 4, 2013, November 18, 2013 and November 21, 2013.

[Fifteen] This also happened to my co-workers, including Tina Boles and Jasmine.

[Sixteen] These co-workers subsequently refused to be paid by check.

[Seventeen] After this happened I demanded that I be paid with a check which he would exchange for cash after I had faxed a copy of the check to the BWC. My bank statements show the checks that Luke Schroll bounced to me. I have attached my bank statements from those months hereto as Exhibit 1.

[Eighteen] I believed that I needed a check as proof of the wages I was earning per the BWC guidelines.

[Nineteen] Although I did not deposit the checks they accurately reflected my earnings and I was given cash by Luke Schroll after I gave him back the check.

[Twenty] At no time did I falsely report any income or fail to report any income to the BWC. All of the checks I faxed to the BWC accurately reflected the payments to me for my work at Pet Paws.

[Twenty-one] I had no knowledge that the BWC would view my not depositing my paycheck into my bank account as being improper.

[Twenty-two] Due to Luke Schroll's mismanagement of the business he was forced to relocate the original location of Pet Paws in approximately January 2014.

[Twenty-three] Luke Schroll had new business cards printed up in January 2014 containing both my name and Luke Schroll's name. A copy of the card is attached as Exhibit 2.

[Twenty-four] The address on the card is * * * which is directly next door to the location of Fire Plug Dog & Cat Grooming in Parma Heights, Ohio.

[Twenty-five] The card shows that Pet Paws did not close it merely changed location and operated out of Fire Plug Dog & Cat Grooming in Parma Heights, Ohio and Pick of the Litter in Strongsville, Ohio.

[Twenty-six] Thereafter, he operated Pet Paws at Fire Plug Dog & Cat Grooming and Pick of the Litter several days a week.

[Twenty-seven] I would groom and bathe the animals at these locations approximately 2-4 hours at Pick of the Litter on Mondays and Wednesdays from January 2014 until July 2014.

[Twenty-eight] I would groom animals at Fire Plug Dog and Cat Grooming on Tuesdays, Fridays and Saturdays for 4-6 hours from January until July 2014.

[Twenty-nine] I continued to do such work for Pet Paws at these facilities.

[Thirty] I ceased working at Pet Paws at the end of July 2014 when Luke Scroll failed to return from vacation and in fact was in inpatient drug and alcohol rehabilitation.

[Thirty-one] I reported all of the income that I received to the BWC as I was instructed to do.

[Thirty-two] I never knew that the BWC required me to actually deposit my work checks into my bank account.

[Thirty-three] I was never aware that by having Luke Schroll provide me cash in exchange for the checks would be considered misleading the BWC.

[Thirty-four] I had no knowledge of the business going into bankruptcy or being considered "closed" until the BWC Investigators mentioned it to me when they came to my house in July. In fact, the business did not close until the end of July 2014 when Luke Schroll went into an inpatient drug and alcohol rehabilitation center.

{¶ 29} 14. Following the February 3, 2015 hearing, the SHO issued an order stating:

It is the order of the Staff Hearing Officer that the District Hearing Officer [sic], issued 11/19/2014, is modified. The Administrator's Motion filed 09/02/2014 requesting an overpayment of living maintenance wage loss benefits for the period commencing 01/06/2013 through 01/12/2013 and from 11/17/2013 through 07/26/2014 and a finding of fraud is granted.

It is the order of the Staff Hearing Officer that the payment of living maintenance wage loss from 01/06/2013 through 01/12/2013 and from 11/17/2013 through 07/26/2014 is declared overpaid. It is the finding of the Staff Hearing Officer that the Injured Worker for the above listed periods failed to accurately report her income to the Administrator and that the income represented to the Administrator as being an accurate representation is not verifiable as so.

The Staff Hearing Officer finds that on 06/08/2005 the Injured Worker sustained an injury to her right foot wherein her right foot was struck by a ladder wheel causing her to fall approximately three feet.

The Staff Hearing Officer finds that as a result of the above injury the Injured Worker was unable to return to work at her former position of employment as a result of restrictions emanating from the claim allowances. The Administrator, as a result, commenced payment of living maintenance wage loss from 01/06/2013 through 01/12/2013 and from 11/27/2013 through 07/26/2014.

The Bureau of Workers' Compensation's Special Investigative Unit began an investigation of Injured Worker Injured Worker on 06/11/2014 after receiving an allegation that Injured Worker had submitted false payroll checks in order to obtain living maintenance wage loss compensation. The findings of the investigation were that checks written to Injured Worker from her Employer Pet Paws, were never negotiated, endorsed, cashed or deposited. The Staff Hearing Officer further finds that the checks submitted to the Administrator as an accurate representation of her full income are not verifiable. The Staff Hearing Officer finds that there is a lack of evidence on file to support Injured Worker's actual income as there are no W-2s, 1099s, cancelled or returned checks and/or bank statements to corroborate the income reported to the Administrator via checks from Pet Paws in support of living maintenance wage loss. Thus the Staff Hearing Officer declares the above period of living maintenance wage loss overpaid.

The Staff Hearing Officer finds that the above declared overpayment is the result of fraud and shall be collected pursuant to R.C. 4123.511(K).

It is the finding of the Staff Hearing Officer that the Administrator has sustained their burden of proof in establishing that the Injured Worker knowingly used deception to obtain the overpayment of living maintenance wage loss in question by probative and substantial evidence pursuant to Ohio Industrial Commission Repayment Policy Memorandum F2, a finding of fraud must be supported by reliable, probative and substantial evidence. The evidence should demonstrate that the individual knowingly used deception to obtain the overpayment. The Staff Hearing Officer finds that the Injured Worker's actions constitute the prima facia elements of fraud in this case.

The Staff Hearing Officer finds that the Injured Worker presented false payroll checks to the Administrator to secure living maintenance wage loss and that those checks were never negotiated, cashed, deposited or endorsed.

The Authorization for Living Maintenance Wage Loss form contains the following warning:

Injured Worker must repot all income to the Administrator for all labor or work performed while receiving living

maintenance wage loss. I understand that my failure to accurately report my income could result in my receiving living maintenance wage loss to which I am not entitled. I further understand that if I fail to accurately report my full income to the Bureau of Workers' Compensation, and in doing so I knowingly, make a false statement, misrepresentation or conceal a fact or perform any other action or act of fraud in order to obtain living maintenance wage loss, I may be subject to felony criminal prosecution.

The Staff Hearing Officer finds that the Injured Worker signed and submitted the Authorization for Living Maintenance Wage Loss forms during the entire period of the declared overpayment.

The Injured Worker had a *duty to accurately report her income without making a false statement or misrepresentation,* which she did not. The Injured Worker presented checks as a representation of her income for work done with Pet Paws as a basis for the payment of living maintenance wage loss compensation and those checks have not been shown to accurately document Injured Worker's income, which is Injured Worker's burden per the Authorization for Living Maintenance Wage Loss contract.

The Injured Worker testified at today's hearing, and it is corroborated in her statement, Attachment 4 of the investigative packet, and in her affidavit submitted at today's hearing that she was aware that the checks she presented to the Administrator would not be cashed or deposited or negotiated and that the checks were used for the sole purpose of obtaining Living Maintenance Wage Loss.

The Injured Worker in conjunction with signing the Authorization for Living Maintenance Wage Loss forms and signing a[nd] completing an Electronic Funds Transfer Application submitted false payroll and personal checks to the Administrator on which the Administrator relied upon to pay living maintenance wage loss compensation.

The Staff Hearing Officer notes that the District Hearing Officer determined that the Injured Worker's Employer, Pet Paws ceased doing business in November of 2013. Further investigation by the Bureau of Workers' Compensation Special Investigative Unit indicates that is not the case. Specifically, statements filed 12/08/2014 that indicate Pet

> Paws rented space at both Fire Plug Dog & Cat Grooming and Pick of the Litter and continued to apparently to [sic] do business beyond November of 2013.
>
> All documentation and evidence on file and presented at hearing was considered.

(Emphasis sic.)

{¶ 30} 15. On March 11, 2015, another SHO mailed an order refusing relator's administrative appeal of the SHO's order of February 3, 2015.

{¶ 31} 16. On June 30, 2015, relator, Maryann Repic, filed this mandamus action.

Conclusions of Law:

{¶ 32} The issue is whether the commission abused its discretion in declaring an overpayment of LMWL compensation and finding that the overpayment was fraudulently obtained.

{¶ 33} Finding no abuse of discretion, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.

{¶ 34} Ohio Adm.Code 4123-18-21(B)(2) currently provides:

> In claims with a date of injury on or after August 22, 1986, the bureau shall make living maintenance wage loss payments to injured workers who complete an approved comprehensive vocational rehabilitation plan or job retention plan, successfully return to work, and experience a wage loss while employed.
>
> (2) Injured workers requesting living maintenance wage loss payments shall be required to submit an application for living maintenance wage loss (on form RH-18 or equivalent) and medical documentation of the physical and/or psychiatric limitations as referenced in paragraph (A)(1) of this rule

{¶ 35} Ohio Adm.Code 4123-18-21(B)(5) currently provides:

> To receive living maintenance wage loss payments under this rule after approval of these benefits by the bureau, an injured worker must provide proof of earnings at least every four weeks, or on a quarterly basis if the injured worker has a substantial variation in income, in the form of pay stubs,

payroll reports from the injured worker's current employer, or a wage statement on form RH-94(A) or equivalent.

{¶ 36} Ohio Adm.Code 4123-18-21(C) currently provides:

Payments shall be sixty-six and two-thirds per cent of the difference between the greater of the injured worker's full weekly wage or average weekly wage on the claim for which the injured worker underwent a rehabilitation plan and the weekly wage received while employed up to a maximum per week equal to the statewide average weekly wage.

The SIU report provides six RH-18 forms captioned "Authorization for Living Maintenance Wage Loss" that were signed by relator during the years 2012, 2013, and 2014. The RH-18 form contains the following warning:

**Warning:** I realize I must report to BWC all income I receive for all labor or work I perform while receiving LMWL. I understand that my failure to accurately report my income could result in my receiving LMWL to which I am not entitled. I further understand that if I fail to accurately report my full income to BWC, and in doing so, I knowingly make a false statement, misrepresent or conceal a fact or perform any other act of fraud in order to obtain LMWL, I may be subject to felony prosecution and may, under appropriate criminal previsions be punished by a fine or imprisonment or both.

{¶ 37} The November 10, 2014 order of the SHO correctly sets forth the six elements of fraud. Those elements were taken from case law. In *Gaines v. Preterm-Cleveland, Inc.,* 33 Ohio St.3d 54, 55 (1987), the Supreme Court of Ohio states:

The elements of an action in actual fraud are: (a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance.

*Id.* at 55.

{¶ 38} As earlier noted, in relator's affidavit at paragraphs 12, 13, 17, and 19, relater avers:

> [Twelve] In January 2013 after faxing a copy of my wages check from Pet Paws to the BWC Luke Schroll asked me if I had cashed my check yet. I indicated that I had not and he requested the check back and gave me cash.
>
> [Thirteen] The checks he wrote to me would not have sufficient funds in the account and would bounce. I was then charged fees by the bank because the checks were not honored.
>
> * * *
>
> [Seventeen] After this happened I demanded that I be paid with a check which he would exchange for cash after I had faxed a copy of the check to the BWC.
>
> * * *
>
> [Nineteen] Although I did not deposit the checks they accurately reflected my earnings and I was given cash by Luke Schroll after I gave him back the check.

{¶ 39} In the SHO's order of February 3, 2015, the SHO states:

> It is the finding of the Staff Hearing Officer that the Administrator has sustained their burden of proof in establishing that the Injured Worker knowingly used deception to obtain the overpayment of living maintenance wage loss in question by probative and substantial evidence pursuant to Ohio Industrial Commission Repayment Policy Memorandum F2, a finding of fraud must be supported by reliable, probative and substantial evidence. The evidence should demonstrate that the individual knowingly used deception to obtain the overpayment. The Staff Hearing Officer finds that the Injured Worker's actions constitute the prima facia elements of fraud in this case.
>
> The Staff Hearing Officer finds that the Injured Worker presented false payroll checks to the Administrator to secure living maintenance wage loss and that those checks were never negotiated, cashed, deposited or endorsed.

{¶ 40} Relator's affidavit itself makes clear that deception was involved.  Relator would fax to the bureau a Pet Paws check that relator never intended to deposit in a bank account or otherwise negotiate.  Rather, relator was paid in cash and returned the check to Luke Schroll.  Faxing the Pet Paws check to the bureau deceptively misrepresented that the check was the instrument of a wage payment when it was not.  Under the circumstances, relator had the option under Ohio Adm.Code 4123-18-21(B)(5) to provide the bureau a wage statement on form RH-94(A) or equivalent, but relator did not provide the form or its equivalent.

{¶ 41} Based upon the forgoing analysis, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.

/S/ MAGISTRATE
KENNETH W. MACKE

**NOTICE TO THE PARTIES**

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).